The first case is InterDigital Technology v. Lenovo Holding Company, Motorola, 2022-15-92. Mr. Argenti, please proceed. Thank you, Your Honor. May it please the Court. In finding the challenge claims unpatentable, the Board erred in three ways, two of which relate to all the challenged claims and one impacting certain pending claims. The two errors that relate to all claims at issue are both with respect to motivation to combine the cited prior arts. First, the Board conflated two different aspects of the Tiedemann reference, believing that Tiedemann's eye bits convey, quote, the best channel quality value. There's no dispute that that's inaccurate. Second, the Board arrived at a new motivation of its own design, finding reason to combine the references in a way Lenovo had not proposed, relying on evidence Lenovo had never cited. This was legal error. Finally, with respect to dependent claims 2, 7, and 15, the Board erred in adopting a construction at odds with the plain language of the claims and the specification. The Board ignored basic grammar, not to mention the specification's explanation of the purpose of reporting channel qualities to the base station. With respect to the Board's first motivation finding, the Board erred in concluding that replacing Tiedemann's eye bits with Gesbert's mean quality value would be a predictable substitution of known elements with the mean value used in the same way as the eye bits. The mean value taken from Gesbert cannot be used in the same way as Tiedemann's eye bits, because the eye bits do not convey a quality. Yeah, and I recognize that maybe there's some confusion in terms of what people said and whether they truncated what they said or abbreviated, but there's enough in the record, is there not, to understand Tiedemann and the eye bits and also the best quality value, and that's what was being looked for, the purposes of the combination, right? I mean, the Board may have dropped the second part of it in some of its narrative, but it's quite clear in the record in its entirety that that was what they were looking at, right? Well, I believe that the record is clear, that the eye bits do not have the function of conveying the best channel quality value, that those are two different things, I would agree with that. Yeah, that's not all they were looking at. They were looking at the eye bits and, I don't know, the language is technical, but this best quality value stuff in the other piece of it, the ECLO, something like that. The EC over IO value, the signal-to-noise ratio. Yeah, I mean, that's what they were talking about in the majority of the narrative in this case, right? Well, respectfully, I think it's not very clear what they were talking about when they clearly confused the two. So, Lenovo had admitted that the eye bits don't convey a best channel quality value, it's clear from the record, both experts are in agreement on this, and then you get to the Board's decision. Tiedemann necessarily knows what the best quality value is when it selects the name of the signal of the base station, right? That's correct. The mobile device knows what the best channel quality value is. In that sense, the name of the strongest signal and the value of the strongest signal are essentially interchangeable. You can choose to identify it by name or you can identify it by value. And I think that was the point that the Board was trying to make, that whether it's the name or the value, you can use either. And here, it's obvious to use the value and to use Guesspert's mean value. So, let's just assume, let's just get away from the shuffling around about whether the right words or wrong words were used and whether the Board was confused and let's assume for the moment that we, the Court, understand the Board as understanding that in Tiedemann, the I bits are the name of the best value signal, and that you're replacing that with the mean value, and whether that is a mere substitution of workable options. But that's a different embodiment of Tiedemann, and it's a different combination that Lenovo had proposed. So, Lenovo proposed a lot of different grounds, many different combinations, and the ground that the Board latched onto in its final decision was the ground based on the I bits. So, I don't think we can just forgive the Board for confusing what the I bits are, because that's the ground that the Board addressed. But what would be wrong with, instead of the I bits, saying that the replacements, instead of the I bits, representing the name of the best value signal, to replace, to use the I bits to identify the overall mean value signal, mean value. And let's assume that's the Board's rationale. So, if we were to assume that the Board understood that the I bits did not convey the best channel quality value, but that they nevertheless intended for the modification to be substituting the mean in for the I bits, which, again, is not what the decision says. But if we were to assume that that's the case, then we still have all these technical problems that would arise that we explained were a problem with doing so, because knowing the best value, or the identity of the best value,  So, substituting out the best value, or the identification of the best value, and replacing it with the mean, results in a fundamental change to Tiananmen, such that it is no longer able to identify, and therefore select, the best base station for communications with the mobile device. It's expanding the pool of available base stations in the handoff set, beyond what would be acceptable quality levels. And we were the only ones who had any evidence on this point. But what, I guess what I'm trying to figure out, what we can do for you at this point, is these are all fact findings, and they're all fact-bound, evidence-based arguments. And here, my understanding is the Board found, that we're looking to develop workable systems that have quality channel information, and with the substituted modified version, you're still going to be able to prune away some of the most unattractive candidates that you could select from. And so, in that way, you're still getting some good channel quality information. And yes, I understand your view that, well, Tietman goes further, and is trying to identify the very best one. But there's other purposes going on inside of Tietman beyond that one. So, I'm not sure whether you have enough in the record to convince the Court that there's some kind of teaching away from making this particular substitution. So, first, as to the last point that was in your question, there are no other purposes in Tietman. There's no evidence of other purposes in Tietman. The Board was wrong to characterize Tietman as having a narrow focus on conveying the best channel quality, while also having a broader focus on just conveying channel quality information generally. That's not supported by Tietman itself. As to the earlier portion of the question about, well, what can we do? This seems like factual issues. These are factual issues that were not weighed or considered by the Board. The Board misunderstood the nature of the IBITS. That's clear from the decision. And then when we get to the technical issues that would arise with using the mean, the Board disregarded those as not relevant to the issues before it. But it did have expert testimony that it relied on. The Board did, in reaching its conclusion. The Board had no expert testimony that it relied on in reaching its conclusion that the IBITS convey the best channel quality value. That's undisputed that that's incorrect. No, we're talking about the further part that you were discussing with Judge Chan and whether you would substitute the mean. As to the harmful and detrimental effects of using the mean in Tietman, the Board had no expert testimony from Lenovo on that. That was something that we raised in our patent owner response. And Lenovo didn't come back with a reply declaration. Now, the Board also erred in determining that a person of ordinary skill in the art would have used two bits to convey Gesbert's mean rather than the three bits that Tietman's IBITS used. And the Board said we'd do that in order to reduce overhead. That was never proposed in the petition or during the IPR. Instead, the petition was crystal clear that Lenovo proposed using three bits for Gesbert's mean just like three bits for the IBITS. In fact, they relied on that as demonstrating the predictability of the combination. There's something in the petition about improving efficiency, right? Yes, there is, and it's very specific that that improvement efficiency was going to be as to the UBITS. And they were also very specific that there would be no change to the number of bits used to convey the IBITS. So while the Board did point out that there was an efficiency allegation in the petition, it was not a general efficiency allegation. It was very specific as to the way that that efficiency improvement would be achieved. And then we get to the oral argument, and Lenovo conceded that that would not apply to the IBITS combination. So that's also clear from the record. Do we review this issue for abuse of discretion, or is this a question of law? This is a question of law. How the Board understands a petition and whether certain arguments were made there to permit the Board to address those arguments in a final written decision. Whether the Board injects a theory of its own into the petition without providing an opportunity for notice and response is an issue of law. It's arbitrary and capricious under the APA. Now, turning to Dependent Claims 2, 7, and 15, here the Board erred additionally in construing the claims to require only receiving a subsequent downlink transmission in response to the first channel quality indication, where that downlink transmission is associated with a modulation encoding set. The plain language of the claim requires receiving a downlink transmission associated with at least one modulation encoding set in response to the transmitted first channel quality indication. Basically, the question is, is the downlink transmission received in response to the first channel quality indication, or is the downlink transmission associated with a modulation encoding set in response to the first channel quality indication? In construing the claim, the Board mistakenly thought that the issue turned on whether the claim term associated with is a verb or not, but that was too narrow a view. Limiting its analysis to the verb or adjective determination led the Board to misinterpret the claims. Is it your view that the way they read the claims is somehow absolutely wrong, that this is a clear, you're right, you're wrong, or is there something in the middle, like there's some ambiguity, but we think we have the best reading? I think we have the most natural reading that's consistent with both the plain language of the claims as well as the specification. Do you acknowledge that there's actually two competing readings here, that you can read it both ways? I think that's true in any claim construction dispute. Well, I don't know about that. Would you appreciate that the Board's reading is not out of left field, that that's not an unreasonable reading of the way the claims are set forth? I would appreciate that the Board adopted Lenovo's view and found that view more compelling than ours, but in doing so, the logic it used to get there is flawed because it thought that all it had to do was decide whether the relevant term was a verb or an adjective, and then it's done. But according to Lenovo's own evidence, that shows that that's not an issue, which is something that we have raised in the brief. That is not a determinative issue. Counsel, do you want to say three minutes or a little bottle of time? You can continue, or I'll save it. Thank you, Your Honor. I'll just briefly point out that our position is also consistent with the specification, which explains that the goal of the invention is to transmit CQ information, that's channel quality information, and determine the proper modulation and coding to use for downlink transmissions. And I would point Your Honors to column 5, lines 19 and 21, and column 3, lines 63, through column 4, line 2, as evidence of that. Thank you. Mr. McAuliffe, is it? Yes, it is. Thank you, Your Honor. May it please the Court. Joe McAuliffe for Lenovo. Your Honor, the issues below turn mostly on whose expert was more credible. The Board expressly agreed that Lenovo's expert's testimony should be credited and expressly rejected crediting InterDigital's expert. That is the job of the Board, to weigh testimony such as expert testimony. It did so... But I think your friend says that the expert, your expert, didn't really go to the heart of what he's complaining about here. Oh, I think he did go to it. I'm not sure which issue you're talking about in particular, but he did testify about both motivations to combine what I'll call the predictable variation rationale and then the increased efficiency rationale. What about trying to understand what is the actual purpose of Tiedemann? Oh, I think... Did Dr. Ancampora talk about that? He talked about it to some degree, and I think the Board understood it completely. And I think that's a key point, because what Mr. Argenti said, and in fact what his expert put in below, mischaracterizes Tiedemann. I heard him say that Tiedemann tries to find the best channel quality value and send that to the base station. That is not the point of Tiedemann. The point of Tiedemann is exactly the opposite, as the Board even mentions. The point of Tiedemann and these U bits is to find the pilot channels that are low, that are below that threshold... But the I bits in Tiedemann identify the best one. They do. And they get transmitted. Though Tiedemann never says... And so Tiedemann is reporting out the collection of very best base stations. The tip-top one, and then its close cousins that also have very high values. True, but it never says, in the context of those messages, what the base station uses for it. And it specifically says, you don't do this in the hand-off procedure. Tiedemann says, don't do this in the hand-off procedure, because it's too slow. So Tiedemann is not doing... Where does your expert say all of that? And where did the Board rely on all of that? The Board at, I believe, Appendix 33, noted that. Joint Appendix 33. I could be wrong on that. But the Board specifically noted that the U-bits are used to turn off certain pilot channels. I'm sorry, I don't have the... Let me see, I think it is 33. I think you're right. Yeah, in the Joint Appendix page 33, System Controller 10 receives the measured power message and determines which of the signals in the active set to remove from the forward traffic channels. Right. That doesn't answer the question of what is the purpose of Tiedemann. And is it not true that Tiedemann is reporting out the very best base stations? See, but you said two different things. The purpose, and is it true, is he reporting the single best? He's definitely reporting the single best. But his purpose is turning off the worst. I mean, the background of Tiedemann says you don't want to be transmitting at the highest power all the time, because it's a CDMA system. What you want is to be transmitting at the lowest power that will get the bits received. And so what Tiedemann's entire U-bit invention is, tell the base station the pilots that are too low and turn them off and maybe turn on some others. But that's the point of this invention. And that's why Dr. Mahan's analysis, in part, why Dr. Mahan's analysis was rejected. He made the same point that Mr. Argenti did. Well, Tiedemann's about sending the highest or best quality value. It does send it. There's no question in that particular embodiment, in that message. But that's not the point of Tiedemann's invention. And that's why our combination made so much sense. Because Gesbert takes a mean and we said, take the mean, calculate the U-bits using the mean, and then package it in, in the message to indicate how the U-bits were calculated, just like the I-bits are used, and send it up. And then the base station can, again, identify the pilots having the lowest quality transmissions and turn them off. That was our combination. So we had two motivations to find two rationals. As I mentioned, I referred to one as the predictable variation, and the other one as an efficiency combination. As for the predictable variation, the board found a couple things. The board found there's a high level of skill in this field. The board found Dr. Acropora's testimony credible, Dr. Mahan's not credible. And those findings were made with a backdrop of our combination, which was very simple. Gesbert just calculates a mean of channel qualities. That's high school algebra. And then, in the combination, you use that with this delta parameter that's in the phone to find the threshold. Again, it's subtraction. And then you calculate the U-bits that way, and you package it in the message. And I think, Your Honor, Judge Chen, you mentioned why can't you use the I-bits to identify the mean rather than the best? That was exactly what our combo was. We said use the same number of bits. So, I mean, we didn't call them the I-bits, but we said three bits. I guess if you wanted to be fussy, though, you would have to acknowledge there's some messy language in the board opinion where it appears that they might have been confused about what the I-bits were really about.  agree that the language, some of the sentences, perhaps could have been written better, but I will say that at Joint Appendix, page 18, the board accurately describes how the U-bits are calculated. At the Joint Appendix, page 18, again, a little lower on the page, the board accurately says that the I-bits identify the best pilot value, general quality value. And going over from Joint Appendix, page 17 to 18, the board accurately describes the proposed combination of Gesvert and Tita. So I think, the court has said it before, it reviews judgments, not opinions, and I think it's clear the board understood the prior art and understood our analysis. What happens to your case if we disagree with the board and don't think you adequately preserve the efficiency motivation issue in your petition? Do you still win under the law? Yeah, because the efficiency was an alternative motivation to combine, and the board expressly said that. It said, before we get to this efficiency stuff, we already found this was an obvious combination. But now we're going to tell you about the efficiency stuff. I think it's Joint Appendix, page 32, I believe. Well, why were they doing that? Why did they need to do that? For Belt and Suspenders issue? I suppose so. Do you think that the board thought that the law required that there be some sort of efficiency motivation in order to establish obviousness? Oh, no, quite the opposite. It said it didn't have to. It said, I've already found obviousness, but I'm going to offer you some more comments. And that efficiency motivation was squarely in the petition and squarely at issue with this particular mapping, or combination, if you will. You know, they don't really argue that it's wrong. What they argue is it's not new. Or, excuse me, it is new. That's their argument. But as I said, Joint Appendix, page 201, is the last page of the petition. That efficiency argument is in there. So they obviously had notice. In fact, they can hardly claim no notice because they cross-examined my expert on the issue. How could they have not known this was that issue and asked those questions? And that really goes to the point here, because this particular argument, you know, sometimes in these IPRs, you get these lawyers who come into a conference room. They're going to question the expert. You're in a conference room, and you have a court reporter, and the expert goes under, and these lawyers think I'm in a deposition. But it's not a deposition. It's cross-examination. What happens here is the classic blunder of cross-examination. They ask an open-ended question. They effectively ask Dr. Akampura, do you have any more evidence that my client's patent is invalid? And he obliged them. He said, yeah. Yeah, you could. Here's another efficiency. I grant you. The two bits thing was not in the petition, as he said. But the efficiency was, they asked for it. They got it. And what's more, that testimony in the record below is in Exhibit 2002. In an IPR proceeding, the 2000 exhibits are the patent owner's exhibits. So are you suggesting there's some theory of invited error in which petitioners are permitted to expand the scope of their invalidity theories presented in their petition? I don't think we expanded it at all. Our invalidity theory... Let's assume I disagree with that. Then where does that leave us? If you found that we expanded it, I think they still have a problem because they did it. So that's the invited error theory. But do we have a Federal Circuit opinion that says that? I feel like we've been pretty disciplined about following SAS since the Supreme Court opinion. Petitioner gets to be the architect of the proceeding, and that architecture is laid out in the petition, where all of the theories are articulated, and you're not allowed to midstream develop new, additional different theories. Oh, but there's a difference between a theory and evidence. And I think this Court has said you can put new evidence in after the petition. And that's what this is. The petition said efficiency. Specifically, we said you could get rid of some sequence numbers from the message, so remove some bits that way. Dr. Akinpura says, well, you could also go from three bits to two bits and remove a bit that way. That's evidence, not a theory. That's my argument. Can you get to... I'm sorry, go ahead. Go ahead. I was just going to move to the claim construction issues. That's what I wanted to hear about. Do you agree with your friend that the Board rested entirely on whether or not associated as a burden or not? That was absolutely the principal argument. I think it also noted, the Board also noted that at least Dr. Mahan's, I believe, testimony about it was focusing on the base station. And that wasn't really at issue here, the base station operations, which is one of the arguments we elaborated on in our brief. But certainly the Board's main analysis was, in response to is an adverbial phrase, receive is a verb, and associated with is an adjective phrase. And so, in response to modifies receive. And, Your Honor, Judge Chen, you asked this question about whether there were two different ways to look at it. I thought that was a really interesting question because InterDigital's main argument below rested on rewriting the claim. That is, instead of associated with, their arguments were based on the phrase be associated with, which arguably does change the adjective aspect of the phrase to a verb aspect. So, my point, the thought I had was that if there really were two different ways to look at it they wouldn't have had to insert a new word into the claim that wasn't there. But, is their understanding of this claim supported by what the specification discloses in that you're transmitting all this channel quality information so that an MCS gets selected? At the base station? Is that what the specification says? No. It's like, the specification says the phone, the mobile station selects the MCS and sends it, indicates it. But, it does say, and this is the only passage rule, But, the point is the MCS gets selected based on the channel quality information. That's accurate. So then, in that way, what we've got going on here is MCS information in response to the transmitted channel quality information. Well, it's the subsequent transmission in response to it. So the subsequent transmission is associated with an MCS and it's received in response to the channel quality stuff. And the only passage, there's only one passage that says then the base station uses the MCS to transmit it. Which I would suggest probably supports either interpretation of that phrase. That sentence. So, if we were to agree with InterDigital, what I had thought was to agree with InterDigital would necessarily introduce some kind of action that's occurring at the base station in a user equipment claim. That's right. But, I had previously said that my understanding was that the base station is selecting the MCS. And now you're telling me no, it's not. It's the phone that's selecting the MCS. But the claim has the phrase associated with the transmission is associated with. So, under their interpretation that would require the base station to associate the MCS selected by the phone with the next transmission. And that is an operation that can only be done at the base station. And the specification doesn't disclose that? It does not. Well, it says it uses it. It says it uses the MCS, but that would support our interpretation as well. That is, the next transmission would be received and that transmission would be a transmission associated with the modulation encodings. I have a few moments. I just want to, if I may, address this. Time has expired. If you have a final thought, please proceed. If you don't agree with my arguments, it has to go back.  resolved one out of many, many grounds and mappings. Thank you, Your Honor. I appreciate it. Mr. Rodriguez, you have a couple of minutes. Thank you, Your Honor. To the first issue regarding the first motivation. We heard my colleague make some arguments about turning off the worst channels. That's not something that they ever raised in a brief. It's not something that you find in the decision. We also heard him argue that the I-bits are not important. It's not important to know what the best channel is in Tiedemann's system. I would refer the court to APPX 2694 through 2695, where their technical expert was repeatedly testifying during cross-examination. It's important to know which channel is the best. I do need to know which is the best in Tiedemann. That's not something that's supported by the record of Lenovo's position now. Turning to the second motivation regarding efficiency. What happened during cross was that their expert gave an answer that was inconsistent with his declaration and the petition theory. We've heard Lenovo admit today that the 2-bit efficiency is not something that they raised in their petition. It's also not something that was ever briefed by either party. For that reason, it was inappropriate for the board to inject it into the case in its final written decision. As to the claim construction argument, we just heard Lenovo's counsel argue that our main argument below was to rewrite the claim. That's not true at all. We made it clear to the board that the issue didn't turn on whether the phrase is a verb or not. We cited that in our during my first chance at the podium. We also heard Lenovo's counsel argue that the MCS is selected by the UE. There is one embodiment where that can happen but as I already provided, there are ample quotes in the specification that the goal of the invention is to allow the base station to select the MCS as well. So the specification is not just describing the base station as applying an MCS that was selected by the UE. Thank you counsel. Thank you.